UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| ERIK S. LONGFELLOW,                )<br>                                                      )<br>              Plaintiff,                 )<br>                                                      )<br>         vs.                                     )<br>                                                      )<br> CAROLYN W. COLVIN, Acting  )<br> Commissioner of the Social Security )<br> Administration,                               )<br>                                                      )<br>              Defendant.             ) | Cause No. 1:14-cv-1645-WTL-TAB |

## ENTRY ON JUDICIAL REVIEW

Plaintiff Erik S. Longfellow requests judicial review of the final decision of Defendant Carolyn W. Colvin, Acting Commissioner of the Social Security Administration ("Commissioner"), denying his application for Supplemental Social Security Income ("SSI") and Disability Insurance Benefits ("DIB") under Titles II and XVI of the Social Security Act (the "Act"). The Court rules as follows.

### I.    PROCEDURAL HISTORY

Longfellow filed an application for SSI and DIB on November 17, 2011, alleging disability beginning December 31, 2008, due to uncontrolled diabetes, neuropathy in his legs, depression, social anxiety disorder, migraines, nerve damage in his back and legs, ketoacidosis, sleep disorder, and a recurring cyst in his tailbone. Longfellow's application was initially denied on February 7, 2012, and again upon reconsideration on April 9, 2012. Thereafter, Longfellow requested a hearing before an Administrative Law Judge ("ALJ"). A pre-hearing conference was held on March 5, 2013, before ALJ James R. Norris. Longfellow subsequently appeared at an administrative hearing held on April 5, 2013, before ALJ Norris. During that hearing, Mark

Farber, M.D., and Jack Thomas, Ph.D., testified as medical experts, and Constance Brown testified as a vocational expert ("VE"). At that hearing it was determined that additional medical development was needed, and the hearing was continued until this information was received. A supplemental hearing was then held on June 12, 2013, before ALJ Norris. During that hearing, Paul Boyce, M.D., and Don Olive, Ph.D., testified as medical experts, and George Parsons testified as a VE. On June 26, 2013, the ALJ issued a decision denying Longfellow's application for benefits. The Appeals Council denied Longfellow's request for review, and this action for judicial review ensued.

## II.   EVIDENCE OF RECORD

The relevant medical evidence of record follows.

### A.  Ball Memorial Hospital

On September 14, 2009, Longfellow was admitted to Ball Memorial Hospital with complaints of severe nausea and vomiting, dehydration, fatigue, and exhaustion. Longfellow was found to have blood sugar levels of 600 with acute acidosis. He was placed on an insulin drip and later switched to insulin sliding scale therapy. His condition improved and he remained stable. Longfellow also underwent psychological evaluation at this time, where "the impression was that the claimant had adjustment disorder with mixed features with a Global Assessment of Functioning (GAF) score of 70." Tr. at 20. Longfellow was provided diabetic education and was discharged on September 18, 2009, with a diagnosis of type I diabetes mellitus, severe dehydration, severe general debility, migraine headaches, depression, and anxiety.

On September 25, 2010, Longfellow returned to Ball Memorial Hospital's emergency room with complaints of abdominal pain, nausea, and weight loss. He was found to have a glucose level of 465 with ketonuria and an elevated anion gap. Longfellow was admitted for

diabetic ketoacidosis and started on an insulin drip. Longfellow was then given a full diabetic diet with subcutaneous insulin and his blood sugars ranged from 130 to 200. He was discharged on September 27, 2010, with a diagnosis of diabetic ketoacidosis, hyponatremia secondary to diabetic ketoacidosis, abdominal pain and nausea, and weight loss.

On November 19, 2010, Longfellow returned to Ball Memorial's emergency room with complaints of abdominal pain, nausea, and vomiting. Longfellow initially claimed to be compliant with his insulin regimen, but admitted to taking nearly three times his prescribed dosage earlier that day. Testing of Longfellow's blood sugar showed it was 936. He also had positive ketones that were high in his serum. He was placed on diabetic ketoacidosis protocol and was provided further education regarding his diabetes.

On March 8, 2011, Longfellow returned to Ball Memorial's emergency room with complaints of nausea and vomiting. His blood sugars were at 377, he had an anion gap, as well as ketoacidosis. Longfellow was put on an insulin drip and given IV fluids. Further education was provided to Longfellow regarding his condition, and he was discharged on March 10, 2011, with a diagnosis of diabetic ketoacidosis, type I diabetes, and asthma.

### B.  Family Medicine Residency Center

On April 22, 2011, Longfellow began treatment at Family Medicine Residency Center. At that time, Longfellow reported a two-year history of diabetes and inquired about insulin pump placement. He stated that his blood sugars averaged 200. Longfellow was assessed with uncontrolled type I diabetes mellitus and his insulin was increased. Further diabetes education was provided to Longfellow, and he was informed that an insulin pump was not recommended at that time.

On May 24, 2011, Longfellow reported to Family Medicine Residency Center that he was unable to fill his prescription for an emergency kit due to the cost. He also reported having back and leg pain that was interfering with his work. He was diagnosed with type I uncontrolled diabetes mellitus and his insulin was increased.

Subsequent visits resulted in Longfellow's insulin being changed and him being prescribed with medication for his back and leg pain. Further diabetic education was also provided.

On August 17, 2011, Longfellow reported using a friend's insulin when not at home. He reported having blood sugar levels over 600 some days, while other days were 200. At this time his pain was controlled with his medication.

On November 9, 2011, it was noted that Longfellow was doing well with his medication, although his blood sugars were still at 200. He was also noted to have variable compliance, as he utilized portions of his recommended dose in an attempt to save money.

On January 27, 2012, it was noted that Longfellow was not using or refilling his medication as prescribed, despite the repeated attempts at improving his education and compliance.

On February 24, 2012, Longfellow was prescribed a cane by his treating physician, Dr. Brown.

On March 26, 2012, it was noted that Longfellow's blood sugars had been averaging in the 200s for the past few months. Although still high, this was said to be a two hundred percent improvement.

On July 2, 2012, Longfellow reported worsening pain and that he occasionally could not get up and walk. He also stated he was out of pain medication. He was found to have continued

diabetes mellitus with neurological manifestations. It was recommended that Longfellow undergo an MRI and an EMG, but he declined to do so for financial reasons.

On August 13, 2012, it was noted that Longfellow's blood sugars typically ranged from 300 to 600, but were sometimes as low as 125. Longfellow admitted to using insulin belonging to a friend that was different from his prescription both in type and dose. It was also noted that Longfellow was using an unprescribed cane; however, Longfellow had been prescribed a cane by Dr. Brown. Longfellow was warned that his continued cavalier attitude toward his medications could ultimately end in his death or disability.

On January 7, 2013, Longfellow was discharged from care at Family Medicine Residency Center after his drug screen came back negative despite the fact that he had been prescribed pain medication. Longfellow denied selling the medication, but could not provide a reason as to the lack of prescription drugs in his system.

### C. Consultative Examinations

On January 25, 2012, at the request of the State Agency, Longfellow underwent a consultative examination by Kevin Schopmeyer, M.D. Dr. Schopmeyer reported Longfellow's history of uncontrolled diabetes with blood sugar levels consistently over 500, neuropathy in his legs with mild improvement on medication, migraines, a bad nerve in his back, nerve damage in his legs, daily symptoms of ketoacidosis, a sleep disorder, and a recurring cyst near his tailbone. Physical examination showed that Longfellow had difficulty getting on and off the examination table. When walking, Longfellow leaned forward and to the left, watched his feet, and had a slow gait and a limp to the left. Longfellow also had "+1 pedal edema and there was pain to palpation of T4, T10, L1-S1, and bilateral sacroiliac joints." Tr. at 18. Furthermore, Longfellow had positive findings of the right shoulder, limited upper extremity reflexes, no lower extremity

reflexes, and decreased touch sensation. Longfellow had full range of motion in all areas. Dr. Schopmeyer's assessment was that Longfellow had uncontrolled diabetes, neuropathy secondary to diabetes, migraines, undiagnosed low back pain, nerve damage in his legs, ketoacidosis secondary to diabetes, sleep disorder, and a resolved recurring cyst in his tailbone.

On April 22, 2013, at the request of ALJ Norris, Longfellow underwent a consultative examination by Doshandra Nelson, M.D. Physical examination showed that Longfellow had a wide-based gait with slow speed and sustainability and stability using a four-pronged cane. Longfellow used his cane for assistance in getting on and off the examination table. He was able to walk ten feet without the assistance of his cane. He was unable to walk on his heels or toes or tandem walk without the use of his cane. He was able to squat with effort and straight leg testing was negative. He had reduced range of motion of the cervical spine and bilateral hips. The assessment was that Longfellow had diabetes, neuropathy in his legs, migraines, nerve damage in his back and legs due to diabetes, ketoacidosis, a sleep disorder, and recurring cysts in his tailbone, all of which were also reported by Longfellow. Dr. Nelson also completed a Medical Source Statement of Ability to Do Work Related Activities, on which Dr. Nelson noted Longfellow's use of a cane and opined that it was medically necessary.

In addition to these physical examinations, Longfellow underwent a consultative mental examination on January 24, 2012. Longfellow reported that he had depression, anxiety, and bipolar disorders. As a result of his depression, Longfellow reported to be restricted to his bed. Additionally, Longfellow reported that he was having panic attacks and that stress and social situations involving more than four or five people triggered his attacks. He also reported anxiety about being in large groups due to his fear of being judged by others. The "diagnostic impression

was that [Longfellow had] panic disorder with agoraphobia and major depressive disorder, recurrent, with a GAF score of 58." Tr. at 20.

### III. APPLICABLE STANDARD

Disability is defined as "the inability to engage in any substantial gainful activity by reason of a medically determinable mental or physical impairment which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of at least twelve months." 42 U.S.C. § 423(d)(1)(A). In order to be found disabled, a claimant must demonstrate that his physical or mental limitations prevent him from doing not only his previous work, but any other kind of gainful employment that exists in the national economy, considering his age, education, and work experience. 42 U.S.C. § 423(d)(2)(A).

In determining whether a claimant is disabled, the Commissioner employs a five-step sequential analysis. At step one, if the claimant is engaged in substantial gainful activity, he is not disabled, despite his medical condition and other factors. 20 C.F.R. § 416.920(a)(4)(i).[1] At step two, if the claimant does not have a "severe" impairment (i.e., one that significantly limits his ability to perform basic work activities), he is not disabled. 20 C.F.R. § 416.920(a)(4)(ii). At step three, the Commissioner determines whether the claimant's impairment or combination of impairments meets or medically equals any impairment that appears in the Listing of Impairments, 20 C.F.R. pt. 404, subpt. P, App. 1, and whether the impairment meets the twelve-month duration requirement; if so, the claimant is deemed disabled. 20 C.F.R. § 416.920(a)(4)(iii). At step four, if the claimant is able to perform his past relevant work, he is

---

[1]The Code of Federal Regulations contains separate sections relating to DIB and SSI that are identical in all respects relevant to this case. For the sake of simplicity, this Entry contains citations to SSI sections only.

not disabled. 20 C.F.R. § 416.920(a)(4)(iv). At step five, if the claimant can perform any other work in the national economy, he is not disabled. 20 C.F.R. § 416.920(a)(4)(v).

On review, the ALJ's findings of fact are conclusive and must be upheld by the court "so long as substantial evidence supports them and no error of law occurred." *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). "Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," *id.*, and the court may not reweigh the evidence or substitute its judgment for that of the ALJ. *Overman v. Astrue*, 546 F.3d 456, 462 (7th Cir. 2008). The ALJ is required to articulate only a minimal, but legitimate, justification for his acceptance or rejection of specific evidence of disability. *Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004). In order to be affirmed, the ALJ must articulate his analysis of the evidence in his decision; while "[he] is not required to address every piece of evidence or testimony," he must "provide some glimpse into [his] reasoning . . . [and] build an accurate and logical bridge from the evidence to [his] conclusion." *Dixon*, 270 F.3d at 1177.

## IV.    THE ALJ'S DECISION

At step one, the ALJ found that Longfellow had not engaged in substantial gainful activity since December 31, 2008, his alleged onset date. At step two, the ALJ concluded that Longfellow suffered from the following severe impairments: insulin dependent diabetes mellitus with peripheral neuropathy, major depressive disorder, and anxiety disorder. At step three, the ALJ determined that Longfellow's severe impairments did not meet or medically equal a listed impairment. Before considering step four, the ALJ concluded that Longfellow had the residual functional capacity ("RFC") to perform:

> light work as defined in 20 CFR 404.1567(b) and 416.967(b) except he can lift, carry, push, and pull 20 pounds occasionally and 10 pounds frequently; occasionally balance, stoop, kneel, crouch, crawl, and climb ramps and stairs; never climb ladders, ropes, or

>scaffolds; never be exposed to heights or machinery; never operate automotive equipment; limited to no more than semi-skilled work; have limited contact with coworkers; and have no contact with the general public.

Tr. at 23. Based on this RFC, the ALJ found at step four that Longfellow could not perform any of his past relevant work. At step five, the ALJ determined that Longfellow could perform jobs existing in significant numbers in the national economy such as a semi-skilled stock clerk order filler, semi-skilled shipping and receiving clerk, semi-skilled photo machine operator, unskilled general office clerk, and unskilled bookkeeping audit clerk. Accordingly, the ALJ concluded that Longfellow was not disabled as defined by the Act from December 31, 2008, through the date of his decision.

## V.  DISCUSSION

Longfellow advances several objections to the ALJ's decision; each is addressed below.

### A.  Longfellow's Use of a Cane

Longfellow argues that the ALJ erred by failing to evaluate the evidence regarding Longfellow's cane usage and either incorporate his need to use a cane into his residual functional capacity finding or articulate his reason for rejecting treating physician Dr. Brown's prescription of a cane and examining physician Dr. Nelson's opinion that Longfellow needed a cane.

The Court agrees that the ALJ failed adequately to evaluate Longfellow's use of a cane. The record reflects that Longfellow was prescribed a cane by Dr. Brown, his treating physician, on February, 24, 2012. On August 13, 2012, staff at the Family Medicine Residency Center noted that Longfellow was using an unprescribed cane, although this classification seems erroneous in light of the prescription by Dr. Brown. On April 22, 2013, Dr. Nelson conducted a consultative physical examination of Longfellow, during which she noted his wide-based gait

with slow speed and sustainability and stability when he used a four-pronged cane. Longfellow needed his cane to get on and off the examination table. He was able to walk ten feet without the cane, but was unable to walk on his heels, toes, or tandem walk without the cane. Dr. Nelson opined that Longfellow's use of the cane was medically necessary.

In his decision, the ALJ recognized that Longfellow was prescribed a cane by Dr. Brown. Tr. at 26. However, the ALJ's evaluation of Dr. Brown's testimony focused solely on a "Medical Statement Regarding Peripheral Neuropathy for Social Security Disability Claim," and did not address the need for a cane. *See id.* at 28. Further, the ALJ gave Dr. Brown's opinion "some weight," and noted that, "Dr. Brown said that the claimant could never perform fine or gross manipulation with his bilateral hands however, in the comment section he stated that the claimant has 'diabetic neuropathy which is affecting his lower extremities.' He does not mention the claimant's upper extremities." *Id.* In evaluating Dr. Nelson's opinions, the ALJ acknowledged without comment Dr. Nelson's opinion that the cane was medically necessary. He determined generally that Dr. Nelson's opinion was only entitled to "some weight" because "the majority of her opinion appears to be based on what the claimant reported he could and could not do, rather than a medical opinion based on the totality of the findings of the examination." *Id*. at 29.

"An ALJ need not specifically address every piece of evidence, but must provide a 'logical bridge' between the evidence and his conclusions. *Varga v. Colvin*, 794 F.3d 809, 813 (7th Cir. 2015). Furthermore, Dr. Brown's status as Longfellow's treating physician requires that his opinion be given a level of analysis above that of a non-treating source.

> A treating physician's opinion that is consistent with the record is generally entitled to "controlling weight." 20 C.F.R. § 404.1527(d)(2); *Schaaf v. Astrue*, 602 F.3d 869, 875 (7th Cir. 2010). An ALJ who rejects a treating physician's opinion must

10

>   provide a sound explanation for the rejection. 20 C.F.R. §
>   404.1527(d)(2); *Campbell v. Astrue,* 627 F.3d 299, 306 (7th Cir.
>   2010); *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007).

*Jelinek v. Astrue*, 662 F.3d 805, 811 (7th Cir. 2011). Moreover, "'[i]f an ALJ does not give a treating physician's opinion controlling weight, the regulations require the ALJ to consider the length, nature, and extent of the treatment relationship, frequency of the examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion.'" *Scott v. Astrue*, 647 F.3d 734, 740 (7th Cir. 2011) (quoting *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009) (citing 20 C.F.R. § 404.1527(d)(2)).

The ALJ erred in his failure to either account for Longfellow's use of a cane in his RFC determination or sufficiently explain his reasoning for rejecting the physicians' opinions that the cane was necessary. Furthermore, given the ALJ's conclusion that the opinion of treating physician Dr. Brown was not entitled to controlling weight, the ALJ was required to articulate the analysis, including his consideration of the factors mentioned above, that led to that determination. The ALJ erred in failing to engage in this analysis. Further, the blanket justification provided by the ALJ for not fully crediting Dr. Nelson's opinion is insufficient.[2] The ALJ should have mentioned explicitly the opinion regarding the medical necessity of the cane

---

[2] The ALJ's reason for giving Dr. Nelson's opinion only "some weight" is that Dr. Nelson's opinion was based on Longfellow's subjective reports. This, of course, means that the ALJ did not find Longfellow to be credible. In assessing the credibility of the claimant, the ALJ must articulate the reasons for his decision in such a way as to "make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." *Brindisi v. Barnhart*, 315 F.3d 783, 787-88 (7th Cir. 2003) (citing SSR 96-7p). In other words, the ALJ is required to "build an accurate and logical bridge between the evidence and the result." *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000). In reviewing the ALJ's decision, it is not entirely clear why the ALJ felt that Longfellow's subjective reports to Dr. Nelson were not credible. This should be corrected on remand.

and then explain the rationale behind why that opinion was rejected if, in fact, it was.[3] If it was not rejected, then Longfellow's need for a cane should have been accounted for in the ALJ's RFC and the hypothetical questions he posed to the VE. Therefore, the Commissioner's decision must be reversed and remanded to correct these errors.

### B. Transferable Skills and SSR 82-41 Compliance

Longfellow argues that ALJ Norris failed to comply with SSR 82-41. Specifically, he argues that because the ALJ determined he was not disabled given his ability to perform semi-skilled occupations other than his past relevant work, the ALJ violated SSR 82-41 by failing to identify his transferable skills.

Based on Longfellow's RFC and VE Parsons' testimony, at step five the ALJ determined that Longfellow could work as a light, semi-skilled stock clerk order filler; a light, semi-skilled shipping and receiving clerk; and a light, semi-skilled photo machine operator. Therefore, Longfellow was found not disabled given the existence of jobs in sufficient quantity in the national economy. As it pertains to transferable skills, the ALJ stated that "[t]ransferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is 'not disabled' whether or not the claimant has transferable job skills." Tr. at 31.

SSR 82-41 provides that, "[w]hen a finding is made that claimant has transferable skills, the acquired work skills must be identified, and specific occupations to which the acquired work

---

[3]Longfellow advances a similar argument regarding Dr. Nelson's opinions regarding his limitations on "handling and fingering," as these opinions were not explicitly evaluated by the ALJ and were cast aside under the ALJ's sweeping conclusion that Dr. Nelson's opinions were based on Longfellow's own, non-credible reports. The Court agrees that the ALJ should have explicitly analyzed this opinion and provided specific reasoning as to why Dr. Nelson's opinion that Longfellow suffers from neuropathy in his hands was rejected.

skills are transferable must be cited in the State agency's determination or ALJ's decision." SSR 82-41. Longfellow cites this requirement as support for the proposition that, "[i]f an ALJ decision determines that a claimant is not disabled based on the claimant's ability to perform semi-skilled or skilled work, the ALJ must make an express finding identifying the claimant's transferable skills." Pl. Br. at 12. Longfellow's position misinterprets the language of the ruling. SSR 82-41 does not create an affirmative duty on the ALJ to make an express finding identifying transferable skills when it finds a claimant is not disabled because of an ability to perform skilled or semi-skilled work; rather, SSR 82-41 only imposes a duty to identify acquired work skills once a finding is made that a claimant has transferable skills and those skills are material to the determination of whether the claimant is disabled. No such finding was made, either explicitly or implicitly,[4] in the instant case. Nor is any authority cited suggesting that an ALJ *must* make a transferable skills finding for a situation comparable to the instant case.[5]

Instead, whether an ALJ must make a determination regarding transferable skills is dependent upon the Medical-Vocational Guidelines and where a claimant falls on the various "grids." In situations in which transferability of skills could be dispositive in the determination of disabled or not disabled, SSR 82-41 requires the ALJ to identify what transferable skills the claimant has that render him not disabled. That is not the situation here. As the ALJ stated, the

---

[4]The ALJ explicitly found that transferability was not material, and Longfellow himself points out "this is . . . not a case in which an ALJ implicitly adopted . . . testimony that a claimant had specific transferable skills." Pl. Br. at 12.

[5]Longfellow cites several cases applying SSR 82-41 to support his position. In each case, the ALJ made a finding that the claimant had transferable job skills, most often because the claimant was of an age or education level where the Medical-Vocational Guidelines framework for determining disability hinged on whether the claimant had transferable job skills. *See Key v. Sullivan*, 925 F. 2d 1056 (7th Cir. 1991); *Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219 (9th Cir. 2009); *Draegert v. Barnhart*, 311 F.3d 468 (2nd Cir. 2002); *Dikeman v. Halter*, 245 F.3d 1182 (10th Cir. 2001).

Medical-Vocational Guidelines, when used as a framework, would not direct a finding of disabled absent a finding of relevant transferable skills, given Longfellow's status as a younger individual with an ability to communicate in English and a high school education.  Therefore, the ALJ correctly found that the transferability of skills was immaterial to his analysis.

### C.  VE Testimony

VE Parsons

Longfellow argues that VE Parsons' testimony was unreasonable and reflected a lack of understanding of the hypothetical question posed to him by the ALJ. Longfellow takes issue with VE Parsons' testimony that Longfellow would be able to perform the functions of order filler, shipping and receiving clerk, and photocopy machine operator despite the limitation that Longfellow never have contact with the public and limited contact with his co-workers. However, VE Parsons testified that these jobs "do not require contact with the public or peers"; in other words, someone would be able to perform the jobs in a manner that would avoid contact with the public and co-workers.  While Longfellow argues that it is unreasonable to suggest these kinds of jobs never require contact with the public or co-workers, there is no evidence in the record that contradicts VE Parsons' testimony on this issue.

VE Brown

As it pertains to VE Brown's testimony, Longfellow argues that the ALJ's hypothetical question posed to VE Brown was defective. The ALJ stated that, "Ms. Brown was posed a hypothetical assuming an individual with the claimant's age, education, and past work experience who is capable of performing only sedentary level work that is unskilled with no fast paced work requirements and only occasional contact with the general public . . . ." Tr. at 32.

14

This hypothetical does not comport with the ALJ's RFC determination, which provided that Longfellow was to have "no contact with the general public." However, because the ALJ's step five decision is supported by VE Parsons, the fact that the ALJ also mentioned VE Brown's opinion in his decision is harmless.

## CONCLUSION

For the foregoing reasons, the decision of the Commissioner is **REVERSED** and this cause is **REMANDED** to the Commissioner for further proceedings consistent with this Entry.

SO ORDERED: 12/3/15

_William T. Lawrence_

Hon. William T. Lawrence, Judge
United States District Court
Southern District of Indiana

Copies to all counsel of record via electronic notification